## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FERNANDO REAL,                     :
    *Plaintiff*,                 :
                       :
    v.                           :      CIVIL ACTION NO. 19-CV-4128
                       :
JOHN WETZEL, *et al.*,             :
    *Defendants*.                :

## MEMORANDUM

**PAPPERT, J.**                                    **DECEMBER 12, 2019**

This matter comes before the Court by way of an Amended Complaint (ECF No. 6),[1] brought by Plaintiff Fernando Real, proceeding *pro se*. Also before the Court is Real's Motion to Proceed *In Forma Pauperis* (ECF No. 4)[2] and his Motion for Appointment of Counsel (ECF No. 7). Because it appears that Real is unable to afford

---

[1] Real initiated this action by way of a Complaint (ECF No. 1) submitted to the Court on September 9, 2019. However, on October 8, 2019, Real submitted an Amended Complaint (ECF No. 6) in this matter. It is well recognized that an amended complaint, once submitted to the Court, serves as the governing pleading in the case because an amended complaint supersedes the prior pleading. *See Shahid v. Borough of Darby*, 666 F. App'x 221, 223 n.2 (3d Cir. 2016) (per curiam) ("Shahid's amended complaint, however, superseded his initial complaint.") (*citing W. Run Student Hous. Assocs. LLC v. Huntingdon Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013)); *see also Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) ("In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity. Thus, the most recently filed amended complaint becomes the operative pleading.") (internal citations omitted). Accordingly, the Amended Complaint Real submitted to the Court after his initial Complaint supersedes the original, and the Court will proceed to screen the Amended Complaint.

[2] At the time Real initiated this matter on September 9, 2019, he failed to pay the fees to commence a civil action or to file a motion to proceed *in forma pauperis*. By Order entered September 18, 2019, the Court directed Real to either pay $400 to the Clerk of Court or file a motion to proceed *in forma pauperis* along with a certified copy of his prisoner account statement within thirty days. (ECF No. 3 at 1.) Real subsequently filed the pending Motion to Proceed *In Forma Pauperis* which is now properly before the Court for review.

to pay the filing fee, the Court will grant him leave to proceed *in forma pauperis*. For the following reasons, the Amended Complaint will be dismissed in part pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and allowed to proceed in part.

I[3]

Real, a prisoner currently incarcerated at State Correctional Institution-Greene ("SCI Greene"), brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Sixth, Eighth, and Fourteenth Amendment rights by the following Defendants: (1) John Wetzel, Secretary of the Pennsylvania Department of Corrections; (2) Thomas Grenevich, a correctional officer at State Correctional Institution-Phoenix ("SCI Phoenix"); (3) John Doe One, a correctional officer at State Correctional Institution-Graterford ("SCI Graterford"); (4) John Doe Two, a correctional officer at SCI Graterford and SCI Phoenix; (5) John Doe Three, a correctional officer at SCI Phoenix; (6) Correctional Officer Turnage from SCI Phoenix; (7) Pennsylvania State Police Trooper Barry Bertolet; (8) Correctional Officer Spagnoletti at SCI Graterford; and (9) John Doe Four, an assistant district attorney in Montgomery County, Pennsylvania. (Am. Compl. ECF No. 6 at 1-2, ¶¶ 4-12.) Real has sued Defendants in their individual and official capacities. (*Id.* ¶ 13.) He also seeks to bring several state law intentional tort claims for conversion and trespass to chattel. (*Id.* ¶¶ 45-46, 53-54, 58.)

Relevant to the claims he seeks to assert in this action, Real alleges that in September 2017, he was incarcerated at SCI Graterford and housed in a single cell in general population. (*Id.* ¶¶ 16,17.) On or about September 16, 2017, Real was involved

---

[3] The facts set forth in this Memorandum are taken from Real's Amended Complaint and the documents and exhibits attached thereto.

2

in a physical altercation with another inmate by the name of Michael Green. (*Id.* ¶¶ 17-18, 27, 35-36.) As a result of that altercation, on or about September 19, 2017, Real was ordered to spend 120 days in the Restricted Housing Unit ("RHU") at SCI Graterford as a sanction for the fight. (*Id.* ¶¶ 17-18.) Several months later, on or about February 22, 2018, a warrant was issued for Real's arrest on a charge of aggravated assault arising from his altercation with Green. (*Id.* ¶ 35.) On approximately May 14, 2019, Real claims that Green "falsely testified" against him at a preliminary hearing indicating that the fight started when Real stabbed Green. (*Id.* ¶ 36.)

In the Amended Complaint, Real alleges that his criminal trial on charges arising from the fight was set to proceed on or about October 28, 2019. Since the time that Real filed his Amended Complaint, however, a search of the publicly available docket for the Court of Common Pleas of Montgomery County reveals that Real did not proceed to trial on October 28, 2019. *Commonwealth v. Real*, CP-46-CR-0004151-2018 (Montgomery Count Court of Common Pleas) at 17. Rather, on October 25, 2019, several of the charges against Real were nolle prossed, and he pled guilty to a lesser misdemeanor charge of possession of an instrument of a crime with intent. *Id.* at 3-4, 17-18. Real was sentenced to no further penalty on that charge. *Id.* at 4.

Nearly all of Real's claims in the present action are related to the September 16, 2017 altercation with Green itself, or the consequences of the events that altercation set in motion. For example, Real alleges in broad terms that while he "was house in segregation for the fight, Defendants forced [Real] to wear dirty clothes and sleep on dirty bed sheets, and then retaliated against [him] when he filed prison grievances complaining about those conditions[.]" (Am. Comp. ECF No. 6 ¶ 14.) Real further asserts that with respect to the criminal charges arising from the altercation,

"Defendants are withholding prison surveillance of the fight that is exculpatory and could exonerate [Real] at his criminal trial for the alleged aggravated assault" in violation of his "First, Sixth and Fourteenth Amendment" rights. (*Id.*)

A

After his altercation with Green, Real was sanctioned and ordered to remain in the RHU for 120 days. (*Id.* ¶ 18.) He alleges that prior to being taken to the RHU, "his personal property was packed and recorded on [a] DC-153m [form] (inmate personal property inventory sheet) . . . and was taken to[,] and held at[,] SCI Graterford's 'property room.'"[4] (*Id.* ¶ 19.) Real contends upon his release from the RHU at SCI Graterford and his transfer to SCI Greene in February 2018, he received his property from SCI Graterford and discovered that several items of personal property were not sent from SCI Graterford to SCI Greene, including a fan, two large pairs of sweat pants, two mirrors, a lamp, and two sweatshirts. (*Id.* ¶ 25.) Real asserts that Defendant John Doe One, a correctional officer at SCI Graterford, "seized [Real's] property without [his] consent – while [Real] was in the RHU at Graterford for the fight – and did not return it to [him]." (*Id.* ¶¶ 24-25.)

---

[4] Real alleges that after he was transferred to the RHU he received a copy of the DC-153m regarding his property and filed a prison grievance alerting prison officials that several of his personal items were not properly recorded on the relevant form including "two (2) large sweat pants; a large sweat shirt; a medium sweat shirt; two mirrors and two headphone extensions." (*Id.* ¶ 21.) He further contends that in response to his grievance, Lieutenant R.G. Zedock at SCI Graterford "confirmed that the above listed property . . . [was] accounted for and was in [Real's] property [in] SCI Graterford's property room," despite the fact that is was not listed on the DC-153m form, and that said property "would be returned to [Real] when he [was] released from the RHU." (*Id.* ¶ 23.)

B

During his time in the RHU, Real alleges that the "showers were not being cleaned" and that he was "denied clean bed sheets and towels[,]" forcing him to "use a dirty towel and sleep on dirty bed sheets." (*Id.* ¶ 27) Specifically, Real claims that from December 2017 through February 2018, despite his request for clean sheets and towels to Defendant Grenevich, he was "forced to use on[e] dirty towel and sleep on the same dirty bed sheets" while in the RHU, which caused Real to "contract[] a rash on his body." (*Id.* ¶¶ 29-30.) Real alleges that Grenevich explicitly refused to give Real clean towels and bed sheets while "fraudulently claiming" they were made available to Real. (*Id.* ¶ 30.) As a result, Real asserts that he filed four separate prison grievances during this time period regarding the lack of clean showers, towels, and bed sheets in the RHU. (*Id.* ¶ 27.) He further asserts that Grenevich was "either named in or was assigned to respond to" the four grievances he filed. (*Id.* ¶ 28.)

Real contends that in retaliation for naming Grenevich in his grievances, Grenevich and Spagnoletti "agreed to issue" paperwork to "process a separation against [Real] and to transfer him to another institution" which caused Real to remain in the RHU until the time of his transfer to SCI Greene, despite the fact that his original sanction to the RHU should have expired in January 2018. (*Id.* ¶¶ 31-33.) Real claims that because of this retaliation by Grenevich and Spagnoletti, he was transferred in February 2018 to SCI Greene which is a five-hour drive from Philadelphia and has resulted in his family being unable to visit him. (*Id.* ¶ 34.)

C

Real alleges that sometime in 2018 while he was housed as SCI Greene, Bertolet "issued a warrant for [Real's] arrest" on a charge of "aggravated assault in regards to

5

the fight with Green on September 16, 2017, at SCI Graterford." (*Id.* ¶ 35.) According to Real, in preparing to defend himself against these criminal charges at his trial, he learned that previously available video evidence of the altercation was no longer available. Specifically, Real contends that a document prepared on or about September 20, 2017, by James A. Meintel, Deputy Superintendent at SCI Graterford, confirms the existence of video surveillance which captured the altercation between Real and Green. (*See* Ex. A to the Am. Comp., ECF No. 6 at 12; *see also* Am. Comp. ¶ 37.) The September 20, 2017 internal DOC communication reveals that there was a "Datacatch" video showing the altercation itself, in addition to two separate handheld camera videos which showed how prisoner officials dealt with each inmate once the altercation was over. (Ex. A to the Am. Comp., ECF No. 6 at 12.) This document was addressed to the Superintendent of SCI Graterford at the time of the incident, Cynthia R. Link, and cc'd to at least one additional prison official. (*Id.*) Moreover, the Pennsylvania State Police Incident Report related to the altercation explicitly acknowledges that the physical evidence was in the possession of officials at SCI Graterford and "consist[ed] of photographs, video surveillance, a sharpened screw, and a lock taken by SCI Graterford." (*See* Ex. B to the Am. Comp., ECF No. 6 at 13; *see also* Am. Comp. ¶ 37.) Real explicitly claims that this video evidence "could exonerate [him] with a justifiable defense" because the "prison video of the fight refutes/contradicts Green's testimony and version of the fight" given at the May 14, 2019 preliminary hearing on the aggravated assault charges. (Am. Comp. ¶¶ 36, 38-39.) Real also alleges that Bertolet and John Doe Four, an Assistant District Attorney, "had a professional obligation to preserve and to disclose the video for [his] criminal trial." (*Id.* ¶ 39.)

However, Real claims that in August 2019, his defense attorney in the criminal matter was informed by John Doe Four that "Defendant [John] Doe Two (correctional staff at SCI Graterford/Phoenix) now alleges there is no video evidence for the September 16, 2017 fight between [Real] and Green." (*Id.* ¶ 40.) Real alleges that John Doe Two "was responsible for preserving the video evidence of the fight . . . for the criminal trial." (*Id.* ¶ 41.) He further contends that Bertolet, John Doe Two, and John Doe Four "negligently or intentionally failed to preserve the video . . ., or they are suppressing it from [Real]."[5] (*Id.*)

## D

Finally, Real claims that in March 2019, while housed at SCI Phoenix, Real "ordered $25.00 worth of items from . . . commissary," and that the $25 was "deducted from [his] inmate account" despite him never having received the items he purchased. (*Id.* ¶ 44.) According to Real, he asked John Doe Three and Defendant Turnage to either give him the items he purchased or to refund the $25 back to his inmate account. (*Id.*) Real alleges that Turnage agreed to refund the $25, but that ultimately Turnage and John Doe Three "failed to pay the $25 back into [Real's] inmate account" or to give him the items in question.[6]

---

[5] It appears from the Amended Complaint that although he was represented by counsel, Real moved *pro se* to dismiss the criminal charges against him on the basis that the video evidence was not preserved and disclosed. (Am. Comp. ¶ 42.) However, Real indicates that the Montgomery County Court of Common Pleas denied the request to dismiss the criminal charges on or about September 18, 2019. (*Id.*) The docket from the criminal matter similarly reflects that Real's *pro se* motion to dismiss was denied. *Commonwealth v. Real*, CP-46-CR-0004151-2018 (Montgomery Count Court of Common Pleas) at 16.

[6] The Amended Complaint does not mention what specific items Real sought to purchase from commissary.

## II

The Court will grant Real leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[7]  Accordingly, 28 U.S.C. § 1915(e)(2)(B) requires the Court to dismiss the Amended Complaint if, among other things, it is frivolous or fails to state a claim.  A complaint is subject to dismissal under § 1915(e)(2)(B)(i) as frivolous if it "lacks an arguable basis either in law or in fact," *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), and is legally baseless if it is "based on an indisputably meritless legal theory."  *Deutsch v. United States*, 67 F.3d 1080, 1085 (3d Cir. 1995).  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Conclusory allegations do not suffice.  *Id.*  As Real is proceeding *pro se*, the Court construes his allegations liberally.  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).  However, in screening the Amended Complaint, which supersedes the original, the Court is limited to the allegations in the Amended Complaint in determining whether Real has stated a claim for relief.  *See Argentina v. Gillette*, Civ. A. No. 19-1348, 2019 WL 2538020, at *1 n.3 (3d Cir. June 20, 2019) (recognizing that "liberal construction of a *pro se* amended complaint does not mean accumulating allegations from superseded pleadings.").

---

[7]  However, because Real is a prisoner, he is obliged to pay the filing fee in installments in accordance with the Prison Litigation Reform Act.  *See* 28 U.S.C. § 1915(b).

III

Real's Amended Complaint alleges claims for violations of his civil rights pursuant to 42 U.S.C. § 1983, the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Furthermore, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

A

At the outset, the Court notes that Real seeks to bring this action against all Defendants in their official capacities. With respect to Defendants who are employed by the Pennsylvania Department of Corrections,[8] Real's official capacity claims fail. The Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003). "Because the Commonwealth of Pennsylvania's Department of Corrections is a

---

[8] Real named the following Defendants who are employed by the DOC: (1) John Wetzel, (2) Thomas Grenevich; (3) John Doe One, a correctional officer at SCI Graterford; (4) John Doe Two, a correctional officer at SCI Graterford and SCI Phoenix; (5) John Doe Three, a correctional officer at SCI Phoenix; (6) Correctional Officer Turnage; and (7) Correctional Officer Spagnoletti.

part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity." *Lavia v. Pennsylvania, Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000). Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment. *A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa. Cons. Stat. § 8521-22, it and its departments, as well as its officials sued in their official capacities, are immune from suits filed in federal court. Accordingly, Real's claims against the DOC Defendants in their official capacities are essentially claims against the Department of Corrections, which are barred by the Eleventh Amendment, and the Court will dismiss those claims with prejudice. The same is also true for any official capacity claims brought against Trooper Bertolet, and the Court will similarly dismiss those claims with prejudice as well. *See Atkin v. Johnson*, 432 F. App'x 47, 48 (3d Cir. 2011) (concluding that the Eleventh Amendment barred a plaintiff's Section 1983 suit against the Pennsylvania State Police and a trooper sued in his official capacity) (citing *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir.2009); *see also Will*, 491 U.S. at 71.

B

In Count VI of the Amended Complaint, Real seeks to bring claims against Secretary Wetzel in his individual capacity for a variety of alleged constitutional deprivations. However, "[a] claim of a constitutional deprivation cannot merely be premised on the fact that the named defendant was a prison supervisor when the

10

incidents set forth in the complaint occurred." *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 949 (M.D. Pa. 2010). Rather, there are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.*

Here, Real's allegations against Secretary Wetzel are insufficient to state a plausible claim against him under § 1983. Although Real labels Wetzel as the "policymaker" for the DOC and claims that Wetzel's "policies, practices and customs," as well as his "deliberate indifference to properly train[ing], supervis[ing], investigat[ing] and discipline[ing] employees" caused the DOC Defendants to violate Real's constitutional rights, (*see* Am. Comp. ¶¶ 56-57), Real presents nothing more than vague and conclusory allegations against Wetzel. These allegations lack adequate factual development to support a plausible inference that Wetzel's actions or inactions caused the claimed constitutional violations. Real also fails to identify any specific or discrete policies developed and promulgated by Wetzel that correspond to each of the alleged constitutional deprivations he claims or describe how these policies were the cause of the deprivations. While Real asserts that Wetzel is "responsible for a pattern

11

and practice of improperly training and disciplining employees[,]" Real does not allege sufficient details regarding the existence of such a pattern, practice, or custom. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (recognizing that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train" and no such pattern is alleged here) (internal quotations omitted). Additionally, the Court notes that Real's allegations against Wetzel appear to conflict with each other because it is not clear whether he is claiming that his rights were violated as a result of a prison policy or because untrained, undisciplined staff failed to follow some unspecified policy. Accordingly, Count VI and all claims against Wetzel in his individual capacity will be dismissed without prejudice.

C

Count II of the Amended Complaint brought against Trooper Bertolet, John Doe Two (a correctional officer at SCI Graterford and SCI Phoenix), and John Doe Four (an assistant district attorney), seeks to challenge the failure of these Defendants to preserve the video evidence of the physical altercation between Real and Green. (Am. Compl. ¶ 48.) Real specifically alleges that when these Defendants "fail[ed] to preserve and disclose the exculpatory video for [Real's] defense at trial" they violated his constitutional rights of access to the courts, to meaningfully prepare a defense and confront and impeach the testimony of his accuser, and to due process of law. (*Id.*) For these violations, he seeks monetary damages against these Defendants by way of § 1983.

In analyzing this Count, it is important to note at the outset that at the time he submitted the Amended Complaint to the Court on October 8, 2019, Real anticipated

that his criminal trial would commence just a few weeks later in late October. However, since the time of that submission, the facts and circumstances have changed considerably. Significantly, Real's criminal trial did not proceed. Rather, the criminal docket for the Montgomery County Court of Common Pleas clearly reflects that as of October 25, 2019, Real entered into a negotiated plea agreement, pled guilty to an updated charge of possession of an instrument of a crime with intent, and was sentenced to no further penalty based on time already served. *Commonwealth v. Real*, CP-46-CR-0004151-2018 (Montgomery Count Court of Common Pleas) at 17-18.

The fact that Real pled guilty on October 25, 2019 is meaningful because "a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). "It is well-settled that a defendant's properly counseled and entered plea of guilty admits all of the elements of a formal criminal charge and waives a multitude of federal constitutional rights, including the privilege against compulsory self-incrimination, the right to confront one's accusers, the right to a jury trial, the right to a speedy trial, and the right to require the prosecutor to prove the crime beyond a reasonable doubt." *Beto v. United States*, Civ. A. No. 01-1669, 2002 WL 1374243, at *2 (E.D. Pa. June 25, 2002) (*citing Tollett*, 411 U.S. at 267).

Count II appears to challenge the conduct of various Defendants on the basis that the failure to preserve and disclose the video surveillance of the fight denied Real: (1) his First Amendment right of Access to the Courts; (2) his Sixth Amendment right to

meaningfully prepare a defense on the charge of aggravated assault; (3) his Sixth Amendment right to confront the witness who testified against him by impeaching his testimony at trial with the video evidence; and (4) his Fourteenth Amendment right to due process by failing to preserve and disclose the video for trial.[9] (Am. Compl. ECF No. 6 ¶ 48.) In this circumstance, however, Real's October 25, 2019 guilty plea represents a break in the chain of events in his criminal proceeding and marks the point at which Real waived his ability to challenge the alleged violations of his federal constitutional rights as set forth in Count II.

Even if this claim were construed broadly to allege that the failure to preserve and disclose the video evidence undermines Real's guilty plea, such a claim is not cognizable. That is because, in order "to recover damages . . . for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (footnote and citation omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's §

---

[9] Real's claim regarding the failure to preserve and disclose exculpatory video evidence in advance of trial had his case actually gone to trial is – at its essence – a *Brady* claim. In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court "announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial[,]" which "proscribes withholding evidence 'favorable to an accused' and 'material to [his] guilt or to punishment.'" *Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (citations omitted). "To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" *Id.* (citations omitted).

1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)— if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)).  Here, Real's Amended Complaint fails to allege or demonstrate in any way that the conviction or sentence arising from the September 16, 2017 altercation was reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by the issuance of a write of habeas corpus.  Accordingly, to the extent Real seeks to challenge the handling of the video evidence in his criminal case to undermine his plea, § 1983 is not the proper vehicle to pursue such a challenge.  Thus, his claims will be dismissed without prejudice subject to refiling as a new case if a challenge to his conviction or sentence is later resolved in his favor.

## D

In Count III of the Amended Complaint, Real seeks to bring an Eighth Amendment claim against Defendant Grenevich asserting that the conditions of his confinement in the RHU constituted cruel and unusual punishment.  The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement, while the Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  Real's Amended Complaint makes clear that he is a convicted inmate, and his claim should therefore be analyzed under the Eighth Amendment.

To establish an Eighth Amendment violation based on the conditions of confinement, a prisoner must establish that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities."  *Rhodes v. Chapman*, 452 U.S.

337, 347 (1981); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (stating that the Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials provide "humane conditions of confinement."). Such necessities include food, clothing, shelter, medical care and reasonable safety. *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). A prisoner must also establish that the defendants acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the prisoner's health or safety or meaning the official is "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, Real alleges that for a period of approximately three months while housed in the RHU he was not regularly provided with clean bed sheets and towels, causing him to use a single dirty towel and single dirty set of bed sheets for that entire time period which ultimately resulted in a painful skin rash. (Am. Comp. ¶¶ 27, 29-30, 49.) Real further asserts that despite asking Defendant Grenevich for clean sheets and towels, Grenevich denied Real's request and refused to give Real clean towels and bed sheets while "fraudulently claiming" they were made available to Real. (*Id.* ¶ 30.) Construing Real's allegations liberally and accepting the facts as true, Real has set forth a plausible Eighth Amendment conditions of confinement claim against Defendant Grenevich for failing to provide Real with clean bed sheets and towels for an extended period of time. While a short-term denial of clean towels, bed sheets, or linens may not, per se, amount to a sufficiently serious deprivation to violate the Eighth Amendment's prohibition on cruel and unusual punishment, "[t]he failure to *regularly* provide prisoners with clean bedding, towels, [and] clothing . . . constitutes a denial of

16

personal hygiene and sanitary living conditions." *Dawson v. Kendrick*, 527 F. Supp. 1252, 1288-89 (S.D. W. Va. 1981) (emphasis added); *see also Glazewski v. Corzine*, Civ. A. No. 06-4107, 2007 WL 3267763, at *6 (D.N.J. Nov. 5, 2007) (allowing prisoner's conditions of confinement claims to proceed after screening under § 1915 where prisoner alleged, among other things, that he was denied clean clothing and sheets). Accordingly, the Court will allow this claim to proceed and direct service upon Defendant Grenevich.

E

In Count IV, Real alleges that Defendants Grenevich and Spagnoletti retaliated against him for filing several prison grievances regarding the conditions of confinement in the RHU which named Grenevich – or to which Grenevich was assigned to respond – when they agreed to process separation paperwork in order to transfer Real to SCI Green. "To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) 'he suffered some adverse action at the hands of prison officials,' and (3) 'his constitutionally protected conduct was a substantial or motivating factor in the decision' to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)) (internal quotations omitted).

With respect to the first requirement, Real has sufficiently alleged that he was engaged in constitutionally protected conduct in that he filed multiple prison grievances naming Defendant Grenevich with respect to the lack of clean bed sheets and towels in the RHU. The Third Circuit has repeatedly recognized that the "filing of grievances [is] an activity protected by the First Amendment." *Collazo v. Rozum*, 646 F. App'x 274, 276 (3d Cir. 2016) (citing *Fantone v. Latini*, 780 F.3d 184, 192 n.8 (3d Cir. 2015)); *see*

*also Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (holding that an inmate's "filing of a grievance to complain about [corrections officer's] behavior is constitutionally protected conduct, and the District Court erred in ruling otherwise.").

With respect to the second requirement, a prisoner must allege "an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights[.]" *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (internal quotations omitted). In this instance, Real alleges that he suffered an adverse action at the hands of prison officials in that he was transferred to a different institution, over five hours away from his original place of incarceration, that resulted in his inability to receive visits from family. Construed liberally at this screening stage of the litigation, this allegation is sufficient to satisfy the adverse action requirement as a transfer that limits the availability of an inmate to receive visits from family is sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See Allen v. Am. Fed'n of Gov't Employees AFL-CIO*, 276 F. App'x 197, 199–200 (3d Cir. 2008) (finding the district court committed reversible error in *sua sponte* dismissing former prisoner's retaliation claim where he alleged he suffered adverse actions, including a prison transfer). With respect to the third requirement, Real has also adequately alleged a plausible claim that the filing of his grievances was a substantial or motivating factor in the decision by Grenevich and Spanoletti to initiate a transfer for Real to SCI Greene. Specifically, Real alleges that these Defendants "agreed to issue" paperwork to "process a separation against [Real] and to transfer him to another institution in retaliation for [Real] filing prison grievances . . ." (Am Comp. ¶ 33.) Accordingly, the Court will allow this claim to proceed and direct service upon Defendant Grenevich and Defendant Spagnoletti.

F

In Counts I and V of the Amended Complaint, Real appears to invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, to raise several state law tort claims for conversion and trespass to chattels regarding the handling of his personal property and commissary money against Defendants John Doe One (a correctional officer at SCI Graterford), John Doe Three (a correctional officer at SCI Phoenix), and Correctional Officer Turnage from SCI Phoenix. (*See* Am. Compl. ECF No. 6 ¶¶ 45, 53-54.) "[U]nder Pennsylvania law, conversion is the 'deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (citation omitted). "The elements of trespass to chattels 'are essentially the same' as conversion. . . . 'A trespass to a chattel may be committed by intentionally: (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.' . . . 'The difference is that conversion entails a more serious deprivation of the owner's rights such that an award of the full value of the property is appropriate."' *Rosemont Taxicab Co. v. Philadelphia Parking Auth.*, 327 F. Supp. 3d 803, 828-29 (E.D. Pa. 2018) (internal citations omitted).

Real alleges that Defendant John Doe One, a correctional officer at SCI Graterford, seized his property without his consent sometime between September 2017 and February 2018 while Real was housed in the RHU, and that Defendant John Doe One did not return his property. (Am. Compl. ¶ 25.) Real contends that upon arriving at SCI Greene he discovered the following property had been seized: a fan, two large sweatpants, two mirrors, a lamp, and two sweatshirts. (*Id.*) In addition, Real asserts

that in March 2019, while housed at SCI Phoenix, Real "ordered $25.00 worth of items from . . . commissary," and that the $25 was "deducted from [his] inmate account" despite him never having received the items he purchased. (Id. ¶ 44.) According to Real, he asked John Doe Three and Defendant Turnage to either give him the items he purchased or to refund the $25 back to his inmate account. (*Id.*) Real alleges that Turnage agreed to refund the $25, but that ultimately Turnage and John Doe Three "failed to pay the $25 back into [Real's] inmate account" or to give him the items in question. (*Id.*)

Accepting these facts as true and construing Real's Amended Complaint liberally, at this early stage of the litigation it appears that Real has alleged a plausible claim for conversion and/or trespass to chattels. *See, e.g.*, *Bracey v. Price*, Civ. A. No. 09-1662, 2011 WL 2620358, at *4 (W.D. Pa. July 1, 2011) (denying prison officials' motion to dismiss prisoner's state law tort claim for conversion regarding the confiscation of prisoner's legal materials where court determined the claim fell within the personal property exception of Pennsylvania's Sovereign Immunity statute, 42 Pa. Con. Stat. Ann § 8522(b)(3)); *Bond v. Rhodes*, Civ. A. No. 05-241, 2006 WL 1617892, at *3–4 (W.D. Pa. June 8, 2006) (allowing inmate's state law claim for conversion to proceed and noting that the claim fell within exception to Sovereign Immunity statute); *cf. Cruz v. SCI-SMR Dietary Servs.*, 566 F. App'x 158, 160 (3d Cir. 2014) (in affirming district court's dismissal of inmate's Fourteenth Amendment claim brought under Section 1983 regarding property deprivations, the court noted that the inmate still had available an adequate post-deprivation remedy in the form of "a common law action for conversion, filed in state court pursuant to 42 Pa. Cons. Stat. Ann § 8522(a), (b)(3)").

Accordingly, the Court will also allow Counts I and V to proceed and direct service on Defendants John Doe One, John Doe Three, and Correctional Officer Turnage.

G

Real also seeks appointment of counsel in this matter. Pursuant to § 1915(e), the Court may request an attorney to represent an indigent plaintiff in a civil action. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."). Although district courts have broad discretion to request counsel for indigent *pro se* litigants, appointment of counsel is not a statutory or constitutional right of the litigant, but rather a privilege. *Brightwell v. Lehman*, 637 F.3d 187, 192 (3d Cir. 2011) (citation omitted); *Montgomery v. Pinchak*, 294 F.2d 492, 498 (3d Cir. 2002). In determining whether to appoint pro bono counsel, the Court must first consider, as a threshold matter, whether the plaintiff's claim has "some merit in fact and law." *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993). If a court finds that the action arguably has merit, it should then consider the following factors (hereafter, the "*Tabron* factors"): (1) the plaintiff's ability to present his or her own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require the testimony of expert witnesses; (6) whether the plaintiff can attain and afford counsel on his own behalf.

*Parham v. Johnson*, 126 F.3d 454, 457 (3d Cir. 1997) (citing *Tabron*, 6 F.3d at 155-56, 157 n.5). This list is not exhaustive, nor is any one factor determinative. *Id.* at 458. Rather, the *Tabron* factors should serve as a guidepost to ensure that courts will only appoint counsel in non-frivolous matters. *Id.*

Real argues that appointment of counsel is necessary here because he has limited access to the prison law library, he does not have internet access, and he will be unable to obtain access to "sensitive" documentation during discovery. (ECF No. 7 at 1.) Real also asserts that because he is a "*pro se* indigent prisoner" he will not be able "to litigate without the assistance of counsel." (*Id.*) Finally, Real contends that some of his claims may turn on credibility determinations – "Plaintiff's word (a pro se prisoner) against Defendant's word (prison staff and state employee)." (*Id.*) Despite these arguments, the Court will deny Real's request for counsel without prejudice because the *Tabron* factors do not weigh in favor of such an appointment at this time. Specifically, with respect to the first factor, Real has clearly been able to present his case to the Court thus far. In addition to his original Complaint, Real also filed a coherent, logical Amended Complaint, which set forth six separate counts, four of which have survived the § 1915 screening process as outlined above. Additionally, although he initially failed to pay the fees in this matter or file a motion to proceed *in forma pauperis*, he promptly reviewed and complied with the Court's Order directing him to do so. He has also regularly updated the Court with respect to his multiple changes of address, and his motion for appointment of counsel itself is well drafted, clear, concise, and cites to the relevant caselaw governing the issue.

Although Real has asserted multiple legal claims, at this time, none of those claims appear to involve complex legal issues and thus factor two similarly weighs against appointment of counsel. It is difficult to accurately assess factors three, four, and five at this early stage of the litigation given that Defendants have not yet been served, have not filed a responsive pleading, and discovery has not begun. However, these factors do not currently weigh in favor of appointment of counsel. Although the

Court has determined that appointment of counsel is premature at this time, the denial of Real's request is without prejudice to his right to renew his motion for counsel at a later date, or to the Court's right to appoint counsel *sua sponte* if circumstances warrant it at a future date.

## VI

For the foregoing reasons, the Court will grant Real leave to proceed *in forma pauperis* and dismiss his Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim with respect to: (1) his official capacity claims, which are dismissed with prejudice; and (2) Counts II and VI, which are dismissed without prejudice. Real's claims as alleged in Counts I, III, IV, and V will be allowed to proceed. The Court will direct service of the Complaint on the remaining Defendants. An appropriate Order follows.

**BY THE COURT:**

***/s/ Gerald J. Pappert***
**GERALD J. PAPPERT, J.**