IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FERNANDO REAL,<br>    *Plaintiff,*<br><br>    v.<br><br>THOMAS GRENEVICH, *et al.*,<br>    *Defendants.* | CIVIL ACTION<br>NO. 19-4128 |

**PAPPERT, J.**                                          October 27, 2021

### MEMORANDUM

*Pro se* prison inmate Fernando Real alleges that Correctional Officer Thomas Grenevich and Captain James Spagnoletti violated his constitutional rights while Lieutenant Turnage[1] failed to return property to him while incarcerated. After a thorough review of the record, including Defendants' Motion for Summary Judgment (ECF 34) and Statement of Undisputed Material Facts (ECF 33) and Real's Response and his Statement of Material Facts (ECF 37), the Court grants Defendants' Motion.

I

Real was housed in the general population at the Pennsylvania State Correctional Institution – Graterford as of September 15, 2017. (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 8.) On September 16, he attacked an inmate named Green. (*Id.* ¶ 9.) By September 19, Department of Corrections staff separated Real from Green and moved Real to the Restricted Housing Unit (RHU) because he had "Assaulted Inmate Green with a Shank." (*Id.* ¶¶ 9-10; *see also* ECF 33-1 ("Inmate Query – Separations").)

---

[1]     Lieutenant Turnage's first name is not included in the record.

1

The assault "caused several puncture wounds to [Green's] chest, shoulder, neck, and wrist." (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 18.) Real was assigned to disciplinary custody for 120 days (i.e., until January 17, 2018). (*Id.* ¶ 10.)

While Real was in the RHU, he prepared and submitted three DOC grievance forms pertaining to the conditions of his confinement there.[2] (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 11.) None of the grievances concerned conditions predating his removal from the general population. (*Id.*) In one, he complained that "no counselor or unit manager has made a round here on L-Block living qua[r]ters in the past three weeks." (ECF 34-2 at ECF p. 1 (Grievance #716280, January 10, 2018, marked received on January 12, 2018).) In a second, he complained that L-Block showers "have not be[en] cleaned in three weeks . . . ." (ECF 34-2 at ECF p. 2 (Grievance #716283, January 10, 2018, marked received on January 12, 2018).) In the third, Real complained he had to use dirty towels, sheets and jumpsuits in the RHU because they had not been exchanged "in the past three weeks" and they caused a rash on his body. (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 12; *see also* ECF 33-2 at ECF p. 1 (Grievance #716279, dated January 14, 2018, but marked received on January 12, 2018).) Defendants acknowledge Real was treated for skin conditions with prescriptions for various creams and ointments during his RHU stay and at other times before and after his RHU stay including on June 13, 2016, September 25, 2017, December 15, 2017, March 21, 2018, May 12, 2018, September 30, 2018 and November 22, 2019. (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 14.)

---

[2]   In his response to Defendants' Motion, Real references four grievances he claims he filed at SCI Graterford in January 2018 which he claims "named or involved Grenevich": #716204, #716279, #716280 and #716283. (Pl.'s Resp., ECF 37 at ECF p. 7.) Grievance #716204 is not attached to his response and is not elsewhere in the record. The others are.

SCI Graterford's Facility Manager subsequently upheld in part and denied in part Real's appeal of the denial of his grievance about the dirty linens. She explained "issues have been identified with the linen and laundry exchanges. The policy was not being followed due to shortage in jumpsuits and bed linens. The problem has been rectified and exchanges will now be conducted in compliance with policy." (*Id.* ¶ 13.) She also wrote that as Unit Manager, Grenevich was "best able to address the issue of linen exchange and laundry services." (*Id.*) She denied Real's request for compensation. (*Id.*) He raises an Eighth Amendment claim against Grenevich based on this complaint. (*See* Am. Compl., ECF 6, Count III.)

On January 18, 2018, Grenevich reported Real was "being processed for a separation" even though he had completed his disciplinary custody. (Pl.'s Resp. (Ex 4), ECF 37 at ECF p. 17-18.) The ranking Corrections Officer on duty reviewed and signed off on a request to maintain Real in his "present status," i.e., in the RHU. (*Id.* at ECF p. 17.) On January 30, 2018, SCI Graterford's administration formally petitioned to transfer Real to SCI Greene and the petition was approved the next day. (ECF 33-5 (PA Department of Corrections Petition System – Permanent Transfer Petition for Fernando Real). Real was transferred to SCI Greene sometime in February 2018. (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 17.) SCI Greene is a ten-hour round-trip from Philadelphia and Real's family is unable to visit him there. (Pl.'s Resp., ECF 37 at ECF p. 7.)

On February 1, 2018, while Real was still at SCI Graterford and after the administration petitioned to transfer him, he complained about his separation to the RHU (which ultimately led to his transfer to SCI Greene) in grievance #720450. (*Id.*

3

¶ 16).  He objected to having to stay in the RHU pending processing of a separation, protested that there was "no need for a separation," and asked to "be returned to general population here at SCI Graterford."  (ECF 33-4 at 2 (Grievance #720450, February 1, 2018.)  On April 5, 2018, after Real appealed from the initial determination of grievance #720450, the Facility Manager wrote that he had been issued a separation as "a direct result of the altercation for which [he] served time in disciplinary custody at SCI Graterford."  (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 16; *see also* ECF 33-4 at 6 (Facility Manager's Appeal Response, Apr. 5, 2018).)  She explained that because of the separation, Real had been required to remain in administrative custody until such time that [he] or the person from whom [he was] separated could be transferred" and, in his case, Real was the inmate who was transferred.  (ECF 33-4 at 6 (Facility Manager's Appeal Response, Apr. 5, 2018).)  Real claims Grenevich and Spagnoletti retaliated against him in violation of the First Amendment based on his separation and transfer.  (*See* Am. Compl., ECF 6, Count IV.)

In 2019, Real was temporarily transferred from SCI Greene to SCI Phoenix because of a criminal case resulting from the September 2017 altercation.[3]  (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 18.)  While there in March 2019, Real ordered $25 worth of items from the commissary, but Defendant Turnage never gave them to him.  (*Id.* ¶ 20.)  Real complained and asked for his money back.  (*Id.* ¶ 21; see also Pl.'s Resp. to Interrogatories, ECF 33-7, ¶ 4 (citing "grievance #798745 "asking for my $25.00

---

[3]  Real was arrested and charged with aggravated assault after he attacked Green.  *See Commonwealth v. Real*, CP-46-CR-0004151-2018 (Montgomery Cnty. Ct. Comm. Pl.).  On October 25, 2019, several of the charges against him were nolle prossed and he pled guilty to a lesser misdemeanor charge of possession of an instrument of a crime with intent.  *Id.*  He was sentenced to no further penalty on that charge.  *Id.*

4

back").) Turnage said the $25.00 would be placed in his inmate account, but he should "be patient and not file this claim again." (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 21; *see also* Pl.'s Resp., ECF 37 at ECF p. 19 (Internal Review Response for Grievance #798745, May 15, 2019).) On May 21, 2020, Real's inmate account was credited $25 for lost or missing commissary items ordered on or around March 5, 2019. (*Id.* ¶ 22; *see also* ECF 33-8 (account statement citing a credit for "LOST BAG 3/15/19 GR# 798745".) Real asserts a state law claim for conversion and/or trespass to chattel against Turnage based on the failure to receive the items in his commissary order or the failure to return the $25 used to purchase the items not received.[4] (*See* Am. Compl., ECF 6, Count V.)

Grenevich was a Correctional Officer assigned to SCI Graterford during the time relevant to Real's claims. (Defs.' Stmt. of Undisp. Mat. Facts, ECF 33, ¶ 4.) Spagnoletti was a Captain there from September 2017 through February 2018. (*Id.* ¶ 7.) And while Real was at SCI Phoenix, Turnage was there as a Lieutenant Correctional Officer. (*Id.* ¶ 6.)

Real filed his initial Complaint in this case on September 9, 2019 (ECF 1) and amended his Complaint on October 8, 2019. (ECF 6.) Pursuant to 28 U.S.C. § 1915(e), the Court screened Real's Amended Complaint which included claims alleging violations of his First, Sixth, Eighth and Fourteenth Amendment rights against moving Defendants and others including the Secretary of the Pennsylvania Department of Corrections, a Pennsylvania State Police Trooper and four John Does. Real was permitted to proceed only with the previously mentioned claims against Grenevich,

---

[4] Real's Amended Complaint also asserts a claim for conversion and trespass to chattel against "Defendant Doe One." (*See* Am. Compl., ECF 6, Count V.) In it he alleges he was deprived of "his sweat pants, sweat shirts, lamp, fan and mirrors . . . ." (*Id.*) He has submitted no evidence in support of this claim.

5

Spagnoletti and Turnage.  (ECF 11.)

II

Summary judgment is proper if Grenevich, Turnage and Spagnoletti prove there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.  Fed R. Civ. P. 56(a).  A fact is "material" if it may affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  A mere scintilla of evidence supporting the nonmoving party – here, Real – will not suffice.  *Id.* at 252.  Rather, Real must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.  Although the Court must liberally construe a *pro se* plaintiff's complaint, in the context of Defendants' motion for summary judgment, Real "still has before him the formidable task of . . . producing evidence 'such that a reasonable jury could return a verdict for [him].'"  *Benckini v. Hawk*, 654 F. Supp. 2d 310, 316 n.1 (E.D. Pa. 2009) (citing *Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) (citation omitted)).

At summary judgment, the Court may consider any material in the record that may be admissible at trial.  *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999).  In doing so, the Court "must view the facts in the light most favorable to [Real] and draw all inferences in [his] favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  But the Court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  Nor may the Court make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313,

323 (3d Cir. 2016).

### III

To prevail on his First Amendment retaliation claim regarding his separation and transfer and his Eighth Amendment claim based on a lack of clean linens and towels, each brought pursuant to 42 U.S.C. § 1983, Real "must show that a person (or persons), acting under color of law, deprived him of a constitutional right." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (citation omitted).

### A

To establish his First Amendment retaliation claim, Real must show: (a) he engaged in constitutionally protected activity; (b) he suffered an adverse action at the hands of Grenevich and Spagnoletti; and (c) a causal link between the protected activity and the adverse action. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001).

In his Amended Complaint, Real alleges he suffered an adverse action when Grenevich and Spagnoletti decided to process a separation against him at SCI Graterford, and another adverse action when they decided to transfer him to SCI Greene. (Am. Compl., ECF 6 at ¶ 52.) To be adverse, an action must "deter a person of ordinary firmness from exercising his rights." *Rauser*, 241 F.3d at 333. Real's 120-day sentence to the RHU, subsequently extended until his transfer, is an adverse action. *See Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003) ("[S]everal months in disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights . . . ."). Defendants concede, only for the purposes of their Motion, that Real's transfer to SCI Greene also satisfies the adverse action requirement because

SCI Greene "is believed to be five hours away from [Real's] family." (Defs.' Mem. in Support of Mot. for Summ. J., ECF 34 at 4 n.2); *see Rauser*, 241 F.3d at 333 (holding evidence prisoner was "transferred to a distant prison where his family could not visit him regularly" was "sufficient evidence adversity to survive summary judgment").

Real's First Amendment retaliation claim, nonetheless, cannot withstand summary judgment because he has not shown his placement in the RHU or his transfer to SCI Greene were causally connected to his grievances. He must present more than "mere speculation that he was transferred in retaliation for filing [a] complaint, or that . . . defendants were personally involved in his various transfer decisions . . . ." *Williams v. Wetzel*, 827 F. App'x 158, 160 (3d Cir. 2020). He has not.

Real was placed in the RHU by September 19, 2017, before he filed any of the grievances included in the record, so his initial separation cannot have been in retaliation for any protected activity. Real's fourth grievance – complaining about his placement in the RHU –cannot support his First Amendment retaliation claim because he brought it after he had already been placed in administrative custody and after the petition to transfer him to SCI Greene had been approved.

There is, however, an "unusually suggestive temporal proximity between" Real's grievances about RHU conditions, "and the allegedly retaliatory action." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). Each were marked received on January 12, 2018. Grenevich reported that Real was being processed for a separation on January 18, just six days later. There is no evidence, however, that either Grenevich or Spagnoletti were personally involved in or had actual knowledge of and acquiesced in the decision to transfer Real to SCI Greene. *Chavarriaga v. N.J. Dept. of Corrs.*, 806

8

F.3d 210, 222 (3d Cir. 2015).  In his verified answers to Real's interrogatories and request for production of documents, Grenevich explained that he had "no involvement in the decision to process a separation" or to transfer Real.  (Grenevich Answers to Pl.'s Interrogs. and Doc. Request, ECF 34-3 at ECF p. 2, ¶¶ 1-2; *id.* at ECF p. 3, ¶¶ 1-2.)  In Spagnoletti's verified answers to Real's interrogatories and request for production of documents, he could not recall the incident between Real and Green "or the specific staff names involved in the separation decision.  (Spagnoletti Answers to Pl.'s Interrogs. and Doc. Request, ECF 34-1 at ECF p. 3, ¶ 5.)  He explained that as a general practice, the Correctional Institution's Security Department investigates altercations between inmates and generally, "the administrative staff involved in separation decisions . . . included the Deputy for Internal Security, Deputy of Facility Management, Deputy of Centralized Services, Inmate Program Manager(s), both Major(s) of the Guard and Unit Managers, and the Superintendent of the institution, subject to review and approval by the Regional Deputy Secretary." (*Id.*)  Real has not set forth any evidence to show that SCI Graterford diverged from its general practices in his case and involved Spagnoletti in his transfer decision.  Without more, his claim cannot survive summary judgment.

Further, Defendants have shown Real would have been transferred to SCI Greene even in the absence of his grievances "for reasons reasonably related to a legitimate penological interest."  *Rauser*, 241 F.3d at 334.  "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422.  As a Pennsylvania State Police report attached to Real's Amended Complaint explains, when Green and Real began fighting, "Real stabbed Green numerous times with a sharpened screw" causing "injuries consisting of lacerations and puncture wounds throughout [Green's] body."

9

(Am. Compl. (Ex. B., ECF 6, at ECF p. 13.) In a declaration, Spagnoletti explained that in his "experience as a Captain with the [Department of Corrections], one inmate attacking another inmate with a shank or similar weapon . . . would in itself be sufficient grounds to support a separation and transfer." (Spagnoletti Decl., ECF p. 33-6 at ECF p. 1, ¶ 5.) Based on Spagnoletti's twenty-eight years of experience, the "decision to transfer [Real] to SCI Greene at the conclusion of his stint in SCI Graterford's Restricted Housing Unit was based on legitimate penological reasons including the safety of other inmates." (*Id.*, at ECF p. 2, ¶ 8.) Mindful of the deference owed to prison officials in such matters, *Rauser*, 241 F.3d at 334, and absent any record evidence to the contrary, no reasonable jury could find in Real's favor as to his retaliation claim.

B

To show that Grenevich violated the Eighth Amendment by not supplying Real with adequate clean linens, towels or jumpsuits, Real must show Grenevich's acts or omissions were "objectively, sufficiently serious, resulting in the denial of the minimal civilized measure of life's necessities." *Mammana v. Federal Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (citations and internal quotations omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Although the Eighth Amendment does not mandate comfortable prisons, prison officials must ensure that inmates receive adequate, food, clothing, shelter and medical care." *Mammana*, 934 F.3d at 373 (citations and internal quotations omitted). In addition, Real must show Grenevich acted with "deliberate indifference," meaning he "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. It

requires "obduracy and wantonness, not inadvertence or error in good faith . . . ." *Whitley v. Albers* 475 U.S. 312, 319 (1986). "[D]eliberate indifference is subjective, not objective . . . meaning . . . it is not sufficient that the official should have been aware" of the existence of the excessive risk. *Mammana*, 934 F.3d at 373 (quoting *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005) (further citations omitted)).

The only record evidence regarding the conditions of the sheets, towels and jumpsuits to which Real had access in the RHU is his grievance #716279 and the responses to it. (*See* Defs.' Stmt. of Undisp. Mat. Facts, ECF 33-2.) When Grenevich responded to the grievance, he explained that, "due to laundry not being done that Saturday," Real had been given an "[o]pportunity to exchange linen on the following Monday" and "due to unforeseen circumstance some times [sic] [laundry] does not happen on the assigned days, but does however take place." (*See* Defs.' Stmt. of Undisp. Mat. Facts, ECF 33-2 at ECF p. 4.) On Real's appeal from Grenevich's response, the Facility Manager concluded that the policy requiring an "at least weekly" linen exchange "was not being followed[ ] due to shortages in jumpsuits and bed linens." (*Id.* at ECF p. 6.) Real is entitled to a reasonable inference that his sheets and towels in the RHU were dirty given the Facility Manager's decision. Without more, however, he cannot demonstrate that the failure to follow the linen exchange policy violated his rights under the Eighth Amendment.

Real has not shown that, in failing to supply clean laundry over a three-week period, Grenevich acted with the "sufficiently culpable state of mind" needed to show "deliberate indifference to inmate health or safety." *Farmer* 511, U.S. at 834. Real argues Grenevich's denial of the request for clean laundry and subsequent grievance

11

response claiming Real had an "opportunity" to get clean linens is evidence of a "culpable state of mind." (Pl.'s Resp., ECF 37 at ECF p. 6.) More is required. At most, the record establishes negligence by failing to provide laundry services on schedule for a limited time. In the absence of any evidence showing Grenevich should have been aware that Real faced a substantial risk of serious harm from a delayed exchange of his linens, the record does not support a claim for an Eighth Amendment violation. Although Real had been treated for a pre-existing skin condition and had a rash while he lacked clean laundry, there is no evidence showing Grenevich was aware of Real's skin condition. Nor is there evidence that Real did not receive appropriate medical treatment for any rash. Based on the record, no reasonable jury could find for Real on his Eighth Amendment claim.

IV

Finally, with the dismissal of Real's federal claims, the Court must decide whether to decline supplemental jurisdiction or to address his state law claims on the merits. *See* 28 U.S.C. § 1367(c)(3). Judicial economy, convenience and fairness to the parties weigh against requiring them to be litigated in state court. *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). No reasonable juror could find for Real on his trespass to chattels or conversion claims with respect to items he never received from the commissary at SCI Phoenix or for the $25, later refunded to him, he was charged for those items.

In Pennsylvania, conversion is the deprivation of or interference with another's right of property in, use of, or possession of a chattel without the owner's consent and without lawful justification. *See PTSI, Inc. v. Haley*, 71 A.3d 304, 314 (Pa. Super. Ct.

2013) (citations omitted); *see also* Restatement (Second) of Torts § 222A (1965). Trespass to chattels "may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217 (1965); *see also Pestco, Inc. v. Associated Prod., Inc.*, 880 A.2d 700, 708 (Pa. Super. Ct. 2005). "It can be said that every conversion includes a trespass to chattels, but not every trespass amounts to a conversion." *Madero v. Luffey*, 439 F. Supp. 3d 493, 516 (W.D. Pa. 2020). "[C]onversion entails a more serious deprivation of the owner's rights such that an award of the full value of the property is appropriate" in the event liability is shown. *Rosemont Taxicab Co. v. Philadelphia Parking Auth.*, 327 F. Supp. 3d 803, 829 (E.D. Pa. 2018) (citation and internal quotation omitted).

      Real's claims for conversion and trespass fall short because he cannot show the "record is clear and free from doubt that [he] was the owner" of the commissary items he claims he did not receive at the time they were allegedly converted or trespassed upon. *See Acme Markets, Inc. v. Seltzer*, 244 A.3d 469, 474 (Pa. Super Ct. 2020) (explaining that the court had to "conclude that the certified record [was] clear and free from doubt that Acme was the owner of the [converted item] at the time [the defendant] took possession of it, and that [the defendant] took possession without justification or Acme's consent" before it could affirm judgment in Acme's favor on its conversion claim). Moreover, even if Real could establish he was the owner of the commissary items at the time of the claimed torts, there is no record evidence to show Turnage was actually involved in the alleged conversion or trespass of the items in Real's commissary order. Rather, the only evidence of Turnage's connection to this claim is

his response to Real's grievance about his missing items. This is not enough to permit this claim to proceed to trial.

To the extent Real's tort claims rest on the delayed refund of the $25 he spent on the missing items, money can be the subject of conversion. *See Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987). However, Real's claims "cannot be sustained in the face of lawful justification on the part of the asserted tortfeasor." *Pioneer Com. Funding Corp. v. Am. Fin. Mortg. Corp.*, 855 A.2d 818, 827 (Pa. 2004). Real consented to having his account debited in exchange for commissary items he acknowledges he attempted to purchase. (*See* Pl.'s Resp., ECF 37 at ECF p. 3 ("Plaintiff purchased items and did not receive the items he purchased.").) Ultimately, Real was refunded the $25 he was charged for items he did not receive. There is no evidence any delay in processing his refund was the result of more than negligence and negligent dispossession does not amount to conversion. Restatement (Second) of Torts § 222, cmt. b (Am. L. Inst. 1965). Moreover, Turnage cannot be liable for conversion where there is no evidence that he took Real's money. Although Turnage's response to Real's grievance informed Real he would be credited $25.00 (*id.* (Ex. 5.) at ECF p 19), this is not evidence that Turnage removed money from Real's commissary account or that he ever held Real's money before it was returned.

An appropriate Order follows.

> BY THE COURT:
>
> ***/s/ Gerald J. Pappert***
> GERALD J. PAPPERT, J.